# UNITED STATES DISTRICT COURT FOR
# THE DISTRICT OF COLUMBIA

| | |
|---|---|
| ANTHONY HILL<br>42426 Fawn Meadow Place<br>Chantilly, Virginia 20152<br><br>          Plaintiff,<br><br>   v.<br><br>MIKE POMPEO, SECRETARY<br>U.S. DEPARTMENT OF STATE<br>2201 C Street NW<br>Washington, DC 20520,<br><br>         Defendant.<br><br>   Serve:<br><br>U.S. ATTORNEY'S OFFICE<br>FOR THE DISTRICT OF COLUMBIA<br>Attn: Civil Process Clerk<br>US Attorney's Office<br>555 4th Street, NW<br>Washington, DC 20530<br>*-Via Certified Mail*<br><br>U.S. ATTORNEY GENERAL<br>950 Pennsylvania Avenue, NW<br>Washington, DC 20530<br>*-Via Certified Mail*<br><br>MIKE POMPEO, SECRETARY<br>U.S. DEPARTMENT OF STATE<br>2201 C Street NW<br>Washington, DC 20520<br>*-Via Certified Mail* | Civil Action No. _____ |

## COMPLAINT AND JURY DEMAND

1.      Plaintiff, Anthony Hill, brings this civil action against defendant Michael

Pompeo, Secretary of State of the United States, for monetary, declaratory, and injunctive relief

for injuries he sustained as a result of the Department of State ("State" or "Defendant") suspending him for one day, which caused State to twice deny him a promotion for which he had been selected, and removing him from his leadership position on the basis of his race (African American) and in retaliation for opposing employment discrimination.

2.     Plaintiff has exhausted his administrative remedies before the Foreign Service Grievance Board ("FSGB") and the Equal Employment Opportunity Commission ("EEOC") and now brings this action to seek reversal of the decision of the FSGB to uphold the suspension.  He seeks this review under the  Administrative Procedure Act, 5 U.S.C. § 706, because the FSGB's decision was arbitrary and capricious, not based on substantial evidence, and contrary to law. SA Hill also seeks *de novo* review of his claims under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-16, that the State Department discriminated against him on the basis of race and reprisal when it suspended him and removed him from his supervisory Team Lead position.

## JURISDICTION AND VENUE

3.     This Court has original jurisdiction over this matter pursuant to 28 U.S.C. § 1331 because Plaintiff seeks relief under the statutes of the United States, and otherwise asserts claims arising under federal law.  This Court also has original jurisdiction pursuant to  28 U.S.C. § 1343, insofar as Plaintiff seeks redress under federal civil rights statutes; original jurisdiction pursuant to 28 U.S.C. § 1346, insofar as Defendant is an officer of the United States acting in his official capacity; and original jurisdiction pursuant to  22 U.S.C. § 4140, with respect to Plaintiff's appeal from a decision of the Foreign Service Grievance Board.

4.     This District is the proper venue for Counts I and II, Plaintiff's claim under the Administrative Procedure Act and Title VII claim concerning his suspension under 28 U.S.C. § 1391, because the decision to suspend Plaintiff was made in this District and, as to Count I,

because Defendant is an officer of the United States.  Pendent venue is appropriate for Counts III

and IV because those claims share  a common core of operative fact with the suspension claims,

Counts I and II.

## PARTIES

5.      Plaintiff Anthony Hill is a citizen of the United States and of the State of Virginia,

who resides at 42426 Fawn Meadow Place, Chantilly, Virginia 20152.  During all relevant times,

Hill has been employed as a Special Agent ("SA") with the Department of State, Bureau of

Diplomatic Security.

6.      Defendant is the Secretary of State and is sued in his official capacity as head of

the Department of State, a federal government agency with its headquarters located at 2201 C

Street, Northwest, Washington, D.C. 20520.

## FACTUAL ALLEGATIONS

### Background

7.      Plaintiff has been a Special Agent in the Bureau of Diplomatic Security of the

Department of State since 2002.  Before joining State, SA Hill was an active member of the

Army National Guard.

8.      In September 2013, SA Hill joined State's Office of Mobile Security

Deployments ("MSD") after being recruited by the then-Director of MSD.

9.      From September 2013 to March 2014, SA Hill completed Green Team, a 6-month

intensive training that prepares agents for special missions teams to enhance security at

embassies.

10.      MSD consists of approximately 11 teams of agents who deploy worldwide to

provide specialized training to overseas personnel and security support in potential and actual

crises.  Agents serve three year assignments in MSD.  Team membership frequently changes.

Each team within MSD has a Team Leader, an Assistant Team Leader and approximately 3-4

team members.

11.     At all times relevant to this case, SSA Kevin Maloy (Caucasian) was MSD

Director.  SSA Nicholas Collura (Caucasian) was Deputy Director and Hill's second-level

supervisor; and SSA Justin Rowan (Caucasian) was an Operations Division Chief ("OPSCO")

and Hill's first-level supervisor.

12.     In March 2014, SA Hill was assigned to Team 2 as its Team Leader.  He would

work under the current Team Leader, SA Ed Stahl (Caucasian), until Stahl left MSD.  At that

time, Hill would replace him as Team Leader.

13.     At the time, SA Hill was the only African American Team Lead at MSD.

14.     When SA Hill joined Team 2 in March 2014, it already consisted of four Team

Members, all of whom were Caucasian.  The Caucasian Team 2 members described themselves

as close friends.

15.     Another Special Agent, Steven Whitaker, was assigned to Team 2 at the same

time as was SA Hill, in March 2014.  SA Whitaker, like SA Hill, is African American.

16.     When SA Hill and Whitaker arrived at MSD after joining Team 2, each of them

found a printed image of a baboon at their new desks.  They were both offended.  Hill mentioned

it to Stahl, who said he could make changes when he became Team Lead.

17.     MSD was tasked with reopening the United States Embassy in Bangui, Central

African Republic ("CAR").  After SA Hill joined Team 2, but before he took over as Team Lead,

Team 2 deployed to CAR to begin preparing for the Embassy reopening.  SA Stahl assigned Hill

and Whitaker driving duties for the entire trip, which are typically reserved for the most junior

team members.

## Hill Bans the Baboon Logo.

18.     In or around May 2014, SA Hill took over as Team Leader and held a Team

meeting.  He explained to Team 2 he found the baboon logo offensive because of the history of

racially derogatory use of images of monkeys and apes.  He told the Team to stop using the logo.

19.     After SA Hill banned the baboon logo, the Caucasian Team 2 members used their

government email accounts to order hundreds of dollars' worth of Team 2 baboon coins, badges,

stickers, and hats.  They jokingly referred to the baboon logo and the word baboon as "racist."

They did not tell SA Hill or Whitaker that they were ordering baboon team gear.

20.     While deployed to Bangui in fall 2014, SA Hill saw the Caucasian Team 2

members were disregarding his order.  One agent's phone lock screen was the baboon image,

and another agent handed out baboon coins to soldiers and local contacts.

## The Caucasian Team 2 Members Complain about Hill.

21.     The Caucasian Team 2 members began discussing requests to transfer off of SA

Hill's team as early as June 2014.  Two team members wrote copious notes to support their

requests.  In addition to their concerted effort to either have Hill removed or have themselves

taken off his team, the Caucasian Team 2 members openly criticized and second-guessed Hill.

22.     Vulgar language, such as telling a coworker to "go f*** yourself," is common at

MSD.  Team members commonly banter back and forth with each other, make inappropriate

jokes, and say inappropriate things.

23.     On June 3, 2014, during a training in West Virginia, Team 2 discussed training

and training schedules.  Though SA Whitaker and another agent yelled at each other about

training obligations, Team 2 agents Dan Balocki and Steve Stockl characterized the meeting as "very aggressive and confrontational," and described Whitaker as behaving "very aggressive at times," and taking a "very hostile tone."  Stockl complained that Hill "did not stop Whitaker from being offensive."  Stockl claimed he "totally lost respect" for Hill after this meeting.

24.     SA Balocki complained that Hill "deferred to Whitaker" on tactical decisions, and that Hill gave more credence to Whitaker's suggestions than to Balocki's.

25.     On June 5, 2014, Team 2 was completing a training exercise down a flight of stairs under simulated fire, wearing heavy gear, and in a cloud of smoke.  Going down the stairs, SA Hill briefly placed his hand on the shoulder of the team member in front of him – Balocki – to steady himself so that he would not fall into the agents in front of him.

26.     At the bottom of the stairs, Balocki turned to Hill and cursed at him.  Hill cursed back and told Balocki to continue the drill.  Later, Balocki would not accept Hill's apology.

27.     After the training, SA Stockl, and Balocki met with SSA Rowan.  Balocki told Rowan that Hill called him a name and shoved him.  Stockl told Rowan he did not want to work with Hill or Whitaker and did not want to attend an upcoming training with them.

28.     SSA Rowan and Hill discussed the incident that same day.  Rowan did not reprimand or discipline Hill.  The matter appeared to close with this informal discussion.

29.     After the events at training, SA Balocki kept notes documenting concerns he had regarding Hill, from June to August 2014.  Many of his complaints centered around Hill using his own judgment, or taking Whitaker's advice, rather than following Balocki's suggestions.

**Allegations concerning SA Hill and SA Jennifer Socha at a shooting range.**

30.     From August 4 to August 6, 2014, SSA Collura and Teams 2 and 3 trained together at a shooting range for their upcoming CAR deployment.  At the training, a group of

agents were joking about the way they looked in their bulletproof gear.  Hill jokingly called a female agent, Jennifer Socha, fat.  She seemed to take offense and he apologized.  He did not touch her.

31.     Socha mentioned the situation to her supervisor, SA Jeffrey Titus (Caucasian), but did not take any other action at the time.

32.     After the training, SA Titus spoke with SA Hill and requested that he not speak to Socha that way.  Titus did not mention any allegation that Hill had touched Socha.

33.      Seven weeks later, on September 29, 2014, while most of Teams 2 and 3 were deployed to CAR, Titus filed a complaint on Socha's behalf with State's Office of Civil Rights ("OCR").  Titus listed only Team 2 Assistant Team Leader Palmer Jones as a witness to the alleged incident.  In the complaint, Titus also noted that Hill and Socha had a positive working relationship.

34.     On October 3, 2014, OCR declined to investigate the complaint Titus had filed.

### Central African Republic 60-day deployment.

35.     Team 2 members deployed to CAR for a 60-day deployment on or about September 9, 2014.  Most Team 3 members joined Team 2 in CAR one week later.

36.     Working and living conditions in CAR were difficult.  Thirteen agents, including Collura, Hill, and Socha, shared a three room house with only two bathrooms.

37.     SA Stockl began documenting events in Bangui immediately upon his arrival in CAR, and attributed most of these problems to Hill, even some in which Hill was barely involved.

38.     Approximately 3 days after reaching CAR, SA Stockl began communicating with Balocki and other agents about a request to transfer of Agent Hill's team.  Balocki and Stockl discussed and coordinated the language and timing of their requests.

39.     On October 1, 2014, Stockl sent OPSCO Rowan the transfer request he had been working on.  Stockl told Rowan that Hill, his supervisor, "still has not earned my trust or respect."  Rowan did not respond.

40.     On October 10, 2014, Team 2, escorting two protectees to the airport in Bangui, encountered a road block, and reversed course.  When the Team returned to the embassy compound, Whitaker and Hill had a short argument about a tactical decision.  Stockl joined in. Hill noticed that that Acting Ambassador was in the compound and told the other agents to take the discussion "out back," *i.e.* out of sight of the Acting Ambassador.  The entire exchanged lasted less than a minute.

41.     Immediately following the incident, SA Hill spoke with SSA Collura, who arrived at the scene just after the situation ended.  Hill told Collura he would apologize to Whitaker and Stockl, and he did.  Collura did not document the event.  Collura did not mention it to Hill again during the entire time Collura remained in CAR, approximately three more weeks.

42.     Later the same day, on October 10, SA Stockl emailed SSA Rowan regarding the incident.  Stockl accused Hill of "attempt[ing] to instigate a fight" between them, and that Hill told Stockl, "let's go out back and handle this like real men."  Stockl repeated the transfer request.  Rowan did not reply.

43.     There were several MSD agents in the the Embassy compound on October 10, 2014 but no other MSD agent corroborates Stockl's claim that Hill said, "let's go out back and handle this like real men."

44.     SA Hill and the rest of Team 2 remained in Bangui for almost 30 days following the incident.

45.     On October 16, 2014, Balocki emailed Jones about using the October 10 incident to push Rowan to remove Hill from Team 2.

46.     On October 28, Jones emailed Rowan requesting a meeting once the Team returned from CAR.  Hill and Whitaker were the only Team 2 members not included on the email.

47.     Near the end of the Team's deployment, on November 5, 2014, Hill saw Jones with baboon coins.  Hill emailed Rowan, Collura, and Team 2 members and said that the Team had not followed his direct order to stop using the logo he found offensive.  He included links to articles explaining why these images offend African Americans.

48.     Later that day, Collura emailed MSD staff banning the use of unofficial team symbols.  MSD staff continued to use the "banned" symbols after Collura's email.  A front office staff member displayed the baboon on her desk until at least January 2015.

49.     On November 10, 2014, the four Caucasian Team 2 members informed SSA David Jordan, Rowan's peer, that they were not willing to remain on a team with Hill on it.  Jordan told them that Rowan would speak with Hill, and that there was a "very good chance" Hill would not continue to be their Team Leader; however, MSD took no action.

**Socha makes new allegations about Hill.**

50.     One month after the Caucasian Team members met with SSA Jordan, there still had been no action and the Team was scheduled to resume training.  On December 8, 2014, Socha and Titus initiated a new complaint against Hill.

51.    Socha emailed Titus on December 8, 2014.  She added a new allegation that had not been in Titus's September complaint.  She claimed, for the first time, that Hill made a comment about rubbing sunscreen on her during the August 2014 training.

52.    In an email to Titus on December 10, Socha claimed, for the first time, that Stockl and Balocki witnessed the events at the shooting range.  Previously, Jones was the only witness.

53.    On or about December 10, Titus went to Rowan and told him that Socha had additional allegations.

### State bans Hill from attending training with his Team, removes him from his leadership position, and issues him an admonishment.

54.    The next day, December 11, 2014, Rowan met with Hill and told him there were "complaints" against him.  Rowan also told Hill, for the first time, that Socha had filed a complaint against him for allegedly harassing and touching her on a shooting range in August 2014.  That was the first time Hill heard that Socha alleged he had touched her. He asked Hill to leave his team voluntarily.

55.    On December 12, 2014, Hill told Rowan that he would not resign from his leadership position, and that he wanted to train with his team.  On December 15, Rowan told Hill that he would not be allowed to train or deploy with Team 2.

56.    Subsequent to Hill refusing to voluntarily leave his Team Leadership position, Collura and Rowan, with authority delegated from Maloy, removed Hill from his leadership position and issued a letter of admonishment.

57.    Prior to taking these actions, neither Rowan nor Collura interviewed Whitaker, who was present at both the June event in West Virginia and the October event in Bangui.

### State transfers Hill to a position without supervisory authority.

58.     After his removal as Team Lead in December 2014, Hill was not given any daily duties.  He was offered a non-supervisory position, which he declined.  Hill essentially held no position after his removal as Team Leader, and he was not assigned any official duties.  He was eventually sent to Quantico around February or March 2015 to assist another SA in training the Marines until he could begin another overseas assignment in late 2015.

59.     The Foreign Service Promotion Board attaches "special value to the ability to lead teams and manage people."

60.     An FS-03, such as SA Hill, who is not promoted within 15 years must leave the Foreign Service.

## OSI Investigation

61.     SSA Rowan initiated an OSI investigation into Balocki's, Stockl's, and Socha's complaints against Hill on December 19, 2014.

62.     Elizabeth Marmesh, the Agent assigned to lead the investigation, had worked in the Washington Field Office of Diplomatic Security at the same time as Balocki and Socha and had been in training with Stockl and EMS training with Jones.  Marmesh wrote to a fellow agent that she "cannot interview [Socha] due to a "conflict of interest."

63.     The Foreign Affairs Manual  provides that any investigator who knows of circumstances about a given case that might even give the perception that the "circumstances could adversely affect the quality of the investigation, must make those circumstances known to the immediate supervisor before initiating the investigation."  12 FAM 221.7-1(a).

64.     Agent Marmesh did not notify her immediate supervisor of what she herself described as a conflict of interest.

11

65.     Ten Memoranda of Interview ("MOI") were created as a result of the OSI investigation Marmesh led.  The witnesses did not review or sign the MOIs.  Several agents, including Agents Hill and Socha, have stated that their MOI's are not accurate.

66.     OSI closed its investigation on March 3, 2015.

**State suspended Hill for one day based on Socha's allegations**
**concerning the August 2014 shooting range training.**

67.     Seven months later, more than a year after the incident in question, on October 5, 2015, SA Hill received notice of a proposed one-day suspension based on one charge of Improper Personal Conduct.  The three specifications supporting this charge were based on the OSI Report of Investigation and arose from allegations about Hill's conduct towards Socha during the August 2014 training session.

68.     Hill admitted to calling Socha "fat" in the context of banter among the agents.  He did not make any other comment about her weight, touch her stomach, or make any comment about sunscreen.

69.     On January 8, 2016, Bruce Williamson, Deputy Assistant Secretary ("DAS") for the Department of State's Bureau of Human Resources in Washington DC, sustained the one-day suspension against Hill.  After Hill filed a grievance and supplemented the record, DAS Constance Diereman, for the Department of State's Bureau of Human Resources in Washington DC, upheld the one-day suspension on October 6, 2016.

70.     In a process independent from consideration of the suspension, the Foreign Service Selection Boards recommended SA Hill for promotion to FS-02 in 2015 and again in 2016, but his name was removed from the rank order list in both years as a result of the one-day suspension, and he was not promoted.  The suspension also hindered his promotional prospects in the following years, as the suspension is set to remain in his file until May 2019 – even though

the Foreign Affairs Manual states that a suspension letter should only be kept in an employee's

file for two years.

## EXHAUSTION OF ADMINISTRATIVE REMEDIES
## ON SUSPENSION BEFORE THE FSGB

71.     On April 4, 2018, the FSGB upheld SA Hill's one-day suspension.  The Board

found that State did not establish, by a preponderance of the evidence, that the "sunscreen"

specification occurred.  The FSGB found it was inherently improbable that the sunscreen

comment occurred as State claimed it did, as State's witnesses all offered different versions as to

what occurred and when.

72.     Even though the same inherent improbabilities also applied to the touching and

weight specifications, the FSGB upheld those specifications, finding State established them by a

preponderance of the evidence.

73.     FSGB heavily relied on Stockl's and Balocki's MOIs in finding State established

the other specifications by a preponderance of the evidence.  Stockl and Balocki were the only

witnesses, besides Socha, who claimed to see Hill touch her.

74.     FSGB rejected the argument that SA Marmesh had violated the Foreign Affairs

Manual requirement that she disclose even perceived conflicts of interest to her supervisor.

Rather than accept Marmesh's own contemporanoues characterization of the situation as a

"conflict of interest," FSGB accepted her *post hoc* justification that she only wanted to make

Socha comfortable with the interview.

75.     FSGB refused to consider evidence of any of the witnesses' racial bias when

considering the reliability of their statements,  claiming the evidence of racial bias was being

considered in Hill's EEOC case.

76.     Hill's EEOC case did not seek to overturn the one-day suspension.

77.    Hill requested that the Board reconsider its decision concerning the evidence of racial bias.  On August 1, 2018, the Board affirmed its decision, again stating it was precluded from considering Hill's evidence of racial bias.

78.    Any aggrieved party may obtain judicial review of a final action of the Secretary or the Board on any grievance if the request for judicial review is filed not later than 180 days after the final action of the Secretary Board.   22 U.S.C. § 4140.  Therefore, this civil action is a timely request for review of the decision of the FSGB to uphold the suspension.

79.    Hill was posted in Afghanistan until October 2018 and therefore had until 180 days after their return to the United States to request judicial review of the final actions of the Secretary and the Boad.  To the extent that it is necessary, Hill had this additional time to make this a timely request for review.

80.    Request for *de novo* review of whether the suspension was racially discriminatory is timely because the final decision of the FSGB was issued on August 1, 2018.  22 U.S.C. § 4140(b)(2).

## EXHAUSTION OF ADMINISTRATIVE REMEDIES
## BEFORE EEOC

81.    On March 12, 2015, SA Hill filed a formal race discrimination and reprisal complaint with the State Department Office of Civil Rights concerning his removal from team leadership, removal from team training, letter of admonishment, and hostile work environment.

82.    More than three years later, in August and September 2018, an EEOC Administrative Judge held a hearing on SA Hill's complaint.  State has yet to issue a final agency decision.  Pursuant to 42 U.S.C. 2000e-16(c), Hill may file his Title VII claims now in this civil action.

14

## COUNT I – REVIEW OF THE BOARD'S DECISION UNDER
## THE ADMINISTRATIVE PROCEDURE ACT, 5 U.S.C. § 701 *et seq.*

83.     Plaintiff incorporates as though restated each of the allegations set forth in the

paragraphs above, and further states as follows:

84.     The Administrative Procedure Act empowers a Court to hold unlawful and set

aside agency action, findings, and conclusions found to be: a) arbitrary, capricious, an abuse of

discretion, or otherwise not in accordance with law; b) contrary to constitutional right, power,

privilege, or immunity; c) in excess of statutory jurisdiction, authority, or limitations, or short of

statutory right; d) or without observance of procedure required by law.  *See* 5 U.S.C. § 706(2);

22 U.S.C. § 4140(a).

85.     In making the foregoing determinations, the Court shall review the whole record

or those parts of it cited by a party, and due account shall be taken of the rule of prejudicial error.

*See* 5 U.S.C. § 706.

86.     The FSGB, as well as State, committed and undertook actions that were arbitrary,

capricious, an abuse of discretion, and not in accordance with law.

87.     The FSGB did not examine all relevant evidence, provide a satisfactory

explanation for its conclusions, or show a rational connection between the facts and the choices

made.

88.     The FSGB did not examine all relevant evidence when it failed to consider the

evidence of racial bias when making credibility determinations regarding the corroborating

witnesses.

89.     The FSGB also did not examine all relevant evidence when it failed to properly

consider all of the evidence of Marmesh's conflict of interest, including her friendship with the

witnesses and Whitaker's affidavit regarding Marmesh's improper communication with Stockl about the OSI investigation.

90.     The FSGB also did not examine all relevant evidence when it failed to consider all of the evidence of the discrepancies and inaccuracies in the MOIs.

91.     The FSGB also did not provide a satisfactory explanation as to why it found there was no basis to conclude that crediting one version of events over the other – Hill's admission that he called Socha "fat" or State's claim that Hill made a sexualized comment about Socha's weight – would call for a different result than the one State arrived at.

92.     The FSGB also did not show a rational connection between the facts and the choices made when it found Marmesh did not violate 12 FAM 221.7-1(a) when she participated in the OSI investigation.

93.     The FSGB also did not provide a satisfactory explanation as to why it found Marmesh did not violate 12 FAM 221.7-1(a) when she participated in the OSI investigation.

94.     The FSGB also did not provide a satisfactory explanation as to why it did not find all of the specifications inherently improbable, when it found one specification was inherently improbable based on record evidence that *also* made the other two specifications improbable.

95.     The FSGB also did not show a rational connection between the facts and the choices made, when it found one specification was inherently improbable based on record evidence that *also* made the other two specifications inherently improbable.

96.     The FSGB also did not show a rational connection between the facts and the choices made, when it found Socha's statements were not self-serving, when she negotiated a favorable assignment based on these events.

97.     The FSGB was not acting in accordance with the law when it ruled the election of remedies provision in 22 U.S.C. § 4139(a)(1) barred the Board from considering evidence of racial bias when making credibility determinations regarding Socha and her supporting witnesses.

98.     The FSGB did not act in accordance with the law when it ruled the election of remedies provision in 22 U.S.C. § 4139(a)(1) barred the Board from considering evidence of inaccuracies and discrepancies in the MOIs.

99.     As a result of State's actions, SA Hill has suffered and continues to suffer actual adverse and harmful effects and injuries, including a suspension and loss of promotion.

100.     Thus, Defendant Pompeo, in his capacity as Secretary of State, is liable to SA Hill under the APA for agency action, findings, and conclusions that were arbitrary, capricious, an abuse of discretion, and otherwise not in accordance with law.

## COUNT II – RACE DISCRIMINATION IN VIOLATION OF TITLE VII OF THE CIVIL RIGHTS ACT OF 1964, 42 U.S.C. § 2000e *et seq.*

101.     Plaintiff incorporates as though restated each of the allegations set forth in the paragraphs above, and further states as follows:

102.     Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e-2(a)(1), forbids an employer from discriminating against an employee on the basis of race.

103.     Defendant is SA Hill's employer within the meaning of 42 U.S.C. § 2000e(b).

104.     Defendant discriminated against SA Hill on the basis of his race (African American) by, inter alia, suspending him for one day without pay because of allegations made against him that were corroborated by the Caucasian Team 2 members, who were racially biased against Hill.

105.     State's decision to suspend Hill was based on the OSI investigation.  In upholding

the proposed suspension, State pointed to Socha's corroborating witnesses – namely Stockl and

Balocki – to find that Socha's version of events were more credible than Hill's.  State did not

take racial bias into account when upholding the proposed suspension.

106.     In upholding the one-day suspension, the FSGB refused to consider Hill's

evidence of racial bias when making credibility determinations.

107.     FSGB repeatedly pointed to Stockl's and Balocki's MOIs to corroborate Socha's

allegations and to find that the specifications against Hill were supported by a preponderance of

the evidence.  Stockl and Balocki were the only witnesses who claimed to see Hill touch Socha.

108.     As the sunscreen specification was not upheld, and the FSGB stated it upheld the

weight specification based on Hill's admission (albeit to a different comment), Stockl and

Balocki were the only witnesses who corroborated Socha's allegations against Hill.  Therefore,

State and the FSGB relied on Stockl's and Balocki's statements to suspend Hill for one day.

109.     Hill was not promoted in 2015 or 2016, even though the Foreign Service

Selection Board recommended he be promoted to FS-02, because of this suspension.

110.     Defendant's actions described above directly and proximately have caused, and

continue to cause, SA Hill to suffer emotional distress, anguish, pain and suffering, humiliation,

indignity, personal embarrassment, damage to his reputation, and loss of past and future income

and benefits.

111.     Defendant's actions described above constitute racial discrimination in violation

of Title VII of the Civil Rights Act of 1964, as amended.

## COUNT III – RACE DISCRIMINATION IN VIOLATION OF
## TITLE VII OF THE CIVIL RIGHTS ACT OF 1964, 42 U.S.C. § 2000e *et seq.*

112.    Plaintiff incorporates as though restated each of the allegations set forth in the

paragraphs above, and further states as follows:

113.    Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e-2(a)(1),

forbids an employer from discriminating against an employee on the basis of race.

114.    Defendant is SA Hill's employer within the meaning of 42 U.S.C. § 2000e(b).

115.    Defendant discriminated against SA Hill on the basis of his race (African

American) by, inter alia, removing him from his leadership position with supervisory authority,

and leaving Hill without any daily duties, subordinates, or supervisory authority.

116.    The Caucasian Team 2 members were racially biased against SA Hill.  Their

behavior suggests they held at least two commonly known stereotypes: that black men are

violent, aggressive, and threatening; and that black men should take orders, not give them.

117.    State admits it removed Hill based on the complaints from the white Team 2

members, making their complaints the proximate cause of the actions taken against Hill.

118.    Management knew that the team members whose complaints led to these actions

had, since May 2014, defied Hill's order not to use the baboon logo.  Management also knew

that Hill and Whitaker were the only African American Team 2 members and that the white

Team members had been complaining about them, admitting they did not respect them, and

requesting transfers to get away from them since the month after Hill took over as Team Leader.

119.    The reasons given for removing Hill as Team Lead and admonishing him were a

pretext for discrimination because they concerned two isolated events that had happened several

months before and that had been resolved after discussions, without documentation, let alone

warnings.

120.    Management acted on the Team's accusations against Hill without investigating the facts, thereby negligently allowing the Team's discriminatory acts to achieve their desired effect.

121.    Defendant's actions described above directly and proximately have caused, and continue to cause, SA Hill to suffer emotional distress, anguish, pain and suffering, humiliation, indignity, personal embarrassment, and damage to his reputation.

122.    Defendant's actions described above constitute racial discrimination in violation of Title VII of the Civil Rights Act of 1964, as amended.

## COUNT IV – RETALIATION IN VIOLATION OF TITLE VII OF THE CIVIL RIGHTS ACT OF 1964, 42 U.S.C. § 2000e, *et seq.*

123.    Plaintiff incorporates as though restated each of the allegations set forth in the paragraphs above, and further states as follows:

124.    Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e-2(a)(1), forbids an employer from retaliating against an employee who engages in protected activity.

125.    SA Hill engaged in protected activity when he opposed his Team's frequent and continued use of a baboon symbol because it was racially offensive to him and other African Americans, and when he complained in writing to MSD management about the hostile environment that his Team had created.  SA Hill was removed from his position less than a month and a half after complaining to MSD management.

126.    Defendant, through SSA Maloy, Collura, and Rowan, retaliated against SA Hill for engaging in protected activity by removing him from his position as Team Leader and leaving him without any daily duties, supervisory authority, or subordinates.

127.    State would not have removed SA Hill from his supervisory role but for his protected activity.

128.    Defendant's actions described above directly and proximately have caused, and continue to cause, SA Hill to suffer emotional distress, anguish, pain and suffering, humiliation, indignity, personal embarrassment, and damage to his reputation.

129.    Defendant's actions described above constitute retaliation in violation of Title VII of the Civil Rights Act of 1964, as amended.

## DEMAND FOR A JURY TRIAL

130.    SA Hill demands a trial by jury on all issues so triable.

## PRAYER FOR RELIEF

Wherefore, Plaintiff respectfully requests that the Court award him the following relief:

A.    Reversal of the decision of the FSGB.

B.    Promotion retroactive to 2015, when promotion was denied to him because of the suspension.

C.    Back pay.

D.    Compensatory damages in an amount to be determined by a jury.

E.    Reasonable costs and experts' and attorneys' fees;

F.    Any other such relief that the Court may deem just and equitable.

Dated:  October 30, 2018

Respectfully submitted,

/s/

_____
David Wachtel, D.C. Bar # 427890
Trister, Ross, Schadler & Gold, PLLC
1666 Connecticut Avenue, N.W.
5th Floor
Washington, DC 20009
(202) 328-1666 ext. 1334
dwachtel@tristerross.com
*Attorney for Plaintiff Anthony Hill*