# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| ANTHONY HILL, | |
| *Plaintiff*, | |
| v. | No. 18-cv-2518 (DLF) |
| MIKE POMPEO, Secretary, United States Department of State, | |
| *Defendant*. | |

## MEMORANDUM OPINION

Plaintiff Anthony Hill brings this lawsuit against defendant Secretary of State Mike Pompeo under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.* (Title VII), and the Administrative Procedure Act, 5 U.S.C. § 701 *et seq.* (the APA).  Before the Court is the Secretary's Partial Motion to Dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6).  Dkt. 9.  For the reasons that follow, the Court will grant the motion in part and deny it in part.

## I.  BACKGROUND

### A. Facts[1]

Hill is employed as a Special Agent in the Bureau of Diplomatic Security of the United States Department of State (State), where he has worked since 2002.  Dkt. 1 (Compl.) ¶ 7.  In September 2013, Hill joined State's Office of Mobile Security Deployments (the Office).  *Id.* ¶ 8. The Office consists of several teams of agents who deploy worldwide to provide specialized

---

[1]Unless otherwise noted, the factual allegations below are drawn from Hill's complaint.  *See Banneker Ventures, LLC v. Graham*, 798 F.3d 1119, 1129 (D.C. Cir. 2015) (court considering motion to dismiss must "accept all the well-pleaded factual allegations of the complaint as true and draw all reasonable inferences from those allegations in the plaintiff's favor").

training to overseas personnel, as well as security support for potential and actual crises.  *Id.*
¶ 10.  At all times relevant to this case, Hill's first-level supervisor was Justin Rowan, and his
second-level supervisor was Nicholas Collura, Deputy Director of the Office.  *Id.* ¶ 11.  Both
Rowan and Collura are Caucasian.  *Id.*

In March 2014, Hill was assigned to Team 2 of the Office as its Team Leader.  *Id.* ¶ 12.
Another Special Agent, Steven Whitaker, was assigned to Team 2 at that same time.  *Id.* ¶ 15.
Both Hill and Whitaker are African American.  *Id.*  When Hill and Whitaker joined Team 2, the
team consisted of four members, all of whom were Caucasian.  *Id.* ¶ 14.  The four Caucasian
team members described themselves as close friends.  *Id.*

When Hill and Whitaker joined Team 2, each of them found a printed image of a
baboon—the team's unofficial logo—at their new desks.  *Id.* ¶ 16.  Both Hill and Whitaker were
offended by the logo.  *Id.*  When Hill officially took over as Team Leader in May 2014, Hill held
a team meeting.  *Id.* ¶ 18.  At this meeting, Hill explained that he found the baboon logo
offensive because of the history of racially derogatory references to apes.  *Id.*  Hill instructed the
members of Team 2 to stop using the baboon as the team logo.  *Id.*

The Caucasian members of Team 2 continued to use the baboon logo nevertheless.  *Id.*
¶ 19.  After Hill banned the logo, the Caucasian team members used their government email
accounts to order hundreds of dollars' worth of baboon coins, badges, stickers, and hats.  *Id.*
They jokingly referred to the baboon logo and the word baboon as "racist."  *Id.*  They did not tell
Hill or Whitaker that they were ordering the baboon gear.  *Id.*  Hill soon discovered that his team
members were disregarding his order, though; one agent's phone lock screen was the baboon
image and another agent was handing out baboon coins to soldiers and local contacts.  *Id.* ¶ 20.

After Hill banned them from using the baboon logo, the Caucasian members of Team 2 began discussing requests to transfer off Team 2. *Id.* ¶ 21. Some team members wrote copious notes in support of their requests. *Id.* For instance, Special Agent Dan Balocki complained that Hill "deferred to Whitaker" on tactical decisions, and that Hill gave more credence to Whitaker's suggestions than to Balocki's. *Id.* ¶ 24. Special Agent Steve Stockl described a meeting in which Whitaker had taken a "very hostile tone" with the Caucasian team members and Hill had failed to reprimand him; Stockl claimed that he "totally lost respect" for Hill as a result. *Id.* ¶ 23.

On June 5, 2014, Team 2 was completing a training exercise down a flight of stairs under simulated fire. *Id.* ¶ 25. Hill lost his balance and placed his hand on the shoulder of the team member standing in front of him, Balocki. *Id.* At the bottom of the stairs, Balocki turned to Hill and cursed at him; Hill cursed back and told Balocki to continue the drill. *Id.* ¶ 26. After the training, Stockl and Balocki met with Rowan (Hill's first-level supervisor). *Id.* ¶ 27. Stockl told Rowan that he did not want to work with Hill or Whitaker and did not want to attend an upcoming training with them. *Id.* Later that day, Rowan discussed the incident with Hill but declined to reprimand or discipline him. *Id.* ¶ 28.

In August 2014, several State employees trained together at a shooting range for their upcoming deployment. *Id.* ¶ 30. While the agents joked about the way they looked in the required bulletproof gear, Hill jokingly referred to agent Jennifer Socha as fat. *Id.* Socha took offense and Hill apologized. *Id.* Nevertheless, Socha mentioned the situation to her supervisor, Special Agent Jeffrey Titus, *id.* ¶ 31, who spoke with Hill after the training and requested that he not speak to Socha that way, *id.* ¶ 32.

On September 9, 2014, Team 2 deployed to the Central African Republic. *Id.* ¶ 35. Stockl began documenting events immediately upon his arrival in the Central African Republic

and attributed numerous problems with the deployment to Hill, regardless of whether Hill was the individual actually responsible. *Id.* ¶ 37. A few days after arriving in the Central African Republic, Stockl began communicating with Balocki and other agents about requesting a transfer off of Hill's team. *Id.* ¶ 38. Balocki and Stockl discussed and coordinated the language and timing of their requests. *Id.* On October 1, 2014, Stockl sent Rowan a transfer request in which he stated that Hill "still has not earned my trust or respect." *Id.* ¶ 39.

On October 10, 2014, while escorting two protectees to the airport, Team 2 encountered a road block and reversed course. *Id.* ¶ 40. Upon their return to the embassy compound, Hill and Whitaker had a short argument about a tactical decision, and Stockl joined in. *Id.* During the argument, Hill told the other agents to take the discussion "out back" to avoid disturbing the Acting Ambassador. *Id.* Immediately following the incident, Hill spoke with Collura (his second-level supervisor), but Collura did not document the event or mention it to Hill again during the remaining three weeks while Collura was deployed with the team. *Id.* ¶ 41.

Later that same day, Stockl emailed Rowan regarding the incident. *Id.* ¶ 42. Stockl accused Hill of "attempt[ing] to instigate a fight" between them and claimed that Hill had told Stockl, "let's go out back and handle this like real men." *Id.* Stockl reiterated his previous transfer request to Rowan. *Id.* On October 16, 2014, Balocki emailed Assistant Team Leader Palmer Jones about using the October 10 incident to persuade Rowan to remove Hill from Team 2. *Id.* ¶ 45. On October 28, Jones emailed Rowan requesting a meeting upon the team's return from the Central African Republic; Jones's email copied all Team 2 members except for Hill and Whitaker. *Id.* ¶ 46.

On November 5, 2014, Hill saw Jones with baboon coins. *Id.* ¶ 47. Hill emailed Rowan, Collura, and the other members of Team 2 and expressed his dismay that the Team had not

followed his direct order to stop using the baboon logo.  *Id.*  He included links to articles explaining why such images offend African Americans.  *Id.*  Later that day, Collura emailed Office staff banning the use of unofficial team symbols, but Office staff continued to use the symbols after Collura's email.  *Id.* ¶ 48.

On November 10, 2014, the four Caucasian members of Team 2 informed David Jordan, an Office supervisor, that they were not willing to remain on a team led by Hill.  *Id.* ¶ 49.  Jordan told them that Rowan would speak with Hill and that there was a "very good chance" that Hill would not continue to be their Team Leader.  *Id.*

On December 8, 2014, Socha emailed Titus (her own supervisor) to make new allegations about Hill.  *Id.* ¶ 51.  She claimed, for the first time, that Hill had made a comment about rubbing sunscreen on her during the August 2014 training.  *Id.*  Soon thereafter, Titus informed Rowan of this additional allegation.  *Id.* ¶ 53.

On December 11, 2014, Rowan met with Hill and informed him that he had been the subject of "complaints."  *Id.* ¶ 54.  He informed Hill, for the first time, that Socha had filed a complaint against him for allegedly harassing her and patting her stomach on the shooting range in August 2014.  *Id.*  This was the first time that Hill had heard that Socha alleged that he touched her.  *Id.*  Rowan asked Hill to leave Team 2 voluntarily, *id.*, but Hill declined to do so, *id.* ¶ 55.  On December 15, Rowan told Hill that he would not be allowed to train or deploy with Team 2.  Subsequently, Collura and Rowan removed Hill from his leadership position and issued him a letter of admonishment.  *Id.* ¶ 56.  Upon his removal as Team Lead, Hill was offered a non-supervisory position, which he declined.  *Id.* ¶ 58.  After that point, he held no position and was not assigned any official duties for a time, before he was assigned to training duties.  *Id.*

On October 5, 2014, Hill received notice of a proposed one-day suspension based on one charge of Improper Personal Conduct. *Id.* ¶ 67. The three specifications supporting this charge arose from allegations about Hill's conduct toward Socha during the August 2014 training session. *Id.* Hill admitted to calling Socha "fat" in the context of banter among the agents, but did not make any other comment about her weight, touch her stomach, or make any comment about sunscreen. *Id.* ¶ 68. On January 8, 2016 a Deputy Assistant Secretary for State's Bureau of Human Resources sustained the one-day suspension against Hill. *Id.* ¶ 69.

On March 12, 2015, Hill filed a formal race discrimination and reprisal complaint with the Equal Employment Opportunity Commission (EEOC) concerning his removal from team leadership, restriction from travel and training, issuance of a letter of admonishment, and subjection to a hostile work environment. *Id.* ¶ 81; *see also* Dkt. 9 (Mot. to Dismiss) Ex. 12 at 1 (EEOC letter listing these four "Accepted Allegations"). Hill's complaint "did not seek to overturn the one-day suspension" that he had sustained following Socha's allegations. Compl. ¶ 76. In 2018, an EEOC Administrative Judge held a hearing on Hill's complaint, but as of the commencement of this litigation, no final agency decision had been issued. *Id.* ¶ 82.[2]

Separately, Hill appealed his one-day suspension to the Foreign Service Grievance Board (the Board). The Board found that State did not establish, by a preponderance of the evidence, that Hill had made the alleged sunscreen comment. *Id.* ¶ 71. The Board found it inherently improbable that the sunscreen comment occurred as State claimed it did, given that State's various witnesses testified inconsistently regarding the alleged comment. *Id.* But the Board concluded that State *had* established by a preponderance of the evidence that Hill made the

---

[2] Hill is nonetheless entitled to file his Title VII claims now pursuant to 42 U.S.C. § 2000e-16(c).

alleged comment regarding Socha's weight and touched Socha's stomach. *Id.* ¶ 72.  On April 4,

2018, the Board upheld Hill's one-day suspension on those two grounds. *Id.* ¶ 71.

Before the Board, Hill argued that his suspension should be overturned because the

witnesses against him were motivated by racial animus.  Dkt. 9, Ex. 7 (Board Decision) at 12.  In

order to allow the Board to consider this and other related allegations, the parties filed a joint

memorandum distinguishing Hill's challenge to his suspension from the racial discrimination

claims then pending in the parallel EEOC proceeding.  *Id.* Ex. 13 (Joint Memorandum).  In that

memorandum, Hill and State jointly stipulated that the matter before the Board did "not involve a

claim of racial discrimination, and thus there is no need for the Board to determine whether it is

permitted to address any such claim." *Id.* at 1–2.  The memorandum subsequently reiterated that

Hill "has not argued that his one-day suspension should be overturned because it was racially

discriminatory." *Id.* at 2.

Notwithstanding these representations, the Board concluded that it was precluded from

considering Hill's claims that the witnesses against him were racially biased given the overlap

between those claims and the ones at issue before the EEOC.  Board Decision at 18–20.  Hill

requested that the Board reconsider its decision concerning the preclusion of his biased-witness

arguments.  Compl. ¶ 77.  But on August 1, 2018, the Board reaffirmed its decision, again stating

that it was precluded from considering Hill's claims of bias.  *Id.*

### B. Procedural History

Hill filed this complaint against the Secretary on October 30, 2018.  *See* Compl.  Hill's

complaint included four claims: (1) an APA claim regarding the Board's decision, *id.* ¶¶ 83–100;

(2) a Title VII race discrimination claim regarding Hill's one-day suspension, *id.* ¶¶ 101–11; (3)

a Title VII race discrimination claim regarding Hill's removal from his leadership role, *id.*

¶¶ 112–22; and (4) a Title VII retaliation claim regarding Hill's removal from his leadership role, *id.* ¶¶ 123–29.  On March 22, 2019, the Secretary filed his motion to dismiss the three Title VII claims.  *See* Mot. to Dismiss.

## II.  LEGAL STANDARD

Rule 12(b)(6) allows a defendant to move to dismiss the complaint for failure to state a claim upon which relief can be granted.  Fed. R. Civ. P. 12(b)(6).  To survive a Rule 12(b)(6) motion, the complaint must contain factual matter sufficient to "state a claim to relief that is plausible on its face."  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).  A facially plausible claim is one that "allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  This standard does not amount to a specific probability requirement, but it does require "more than a sheer possibility that a defendant has acted unlawfully."  *Id.*  A complaint need not contain "detailed factual allegations," but alleging facts that are "merely consistent with a defendant's liability . . . stops short of the line between possibility and plausibility."  *Id.* (internal quotation omitted).

Well-pleaded factual allegations are "entitled to [an] assumption of truth," *id.* at 679, and the court construes the complaint "in favor of the plaintiff, who must be granted the benefit of all inferences that can be derived from the facts alleged," *Hettinga v. United States*, 677 F.3d 471, 476 (D.C. Cir. 2012) (internal quotation omitted).  But the assumption of truth does not apply to a "legal conclusion couched as a factual allegation."  *Iqbal*, 556 U.S. at 678 (internal quotation omitted).  An "unadorned, the defendant-unlawfully-harmed-me accusation" is not credited; likewise, "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice."  *Id.*

Ultimately, "[d]etermining whether a complaint states a plausible claim for relief . . . [is]

a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Id.* at 679.  When deciding a Rule 12(b)(6) motion, the court may consider only the complaint itself, documents attached to the complaint, documents incorporated by reference in the complaint, and judicially noticeable materials.  *EEOC v. St. Francis Xavier Parochial Sch.*, 117 F.3d 621, 624 (D.C. Cir. 1997).  Because "Title VII's exhaustion requirements are not jurisdictional," *Artis v. Bernanke*, 630 F.3d 1031, 1034 n.4 (D.C. Cir. 2011) (citations omitted), "a 12(b)(6) motion to dismiss for failure to state a claim upon which relief can be granted is the appropriate vehicle to challenge an alleged failure to exhaust administrative remedies under Title VII." *Mahoney v. Donovan*, 824 F.Supp.2d 49, 58 (D.D.C. 2011) (internal quotation marks and citations omitted).

## III.  ANALYSIS

The Secretary moves to dismiss Hill's three Title VII claims: (1) the race discrimination claim regarding Hill's one-day suspension; (2) the race discrimination claim regarding Hill's removal from his leadership role; and (3) the retaliation claim.  The Court will grant the Secretary's motion with respect to the first claim but deny it with respect to the other two.

### A.  Race Discrimination Claim Regarding Hill's One-Day Suspension

Count II of Hill's complaint alleges that the Secretary "discriminated against [Hill] on the basis of his race" by "suspending him for one day without pay because of allegations made against him that were corroborated by the Caucasian Team 2 members, who were racially biased against Hill." Compl. ¶ 104.  The Secretary argues that this claim should be dismissed because Hill never exhausted such a claim at the administrative level.  Mot. to Dismiss at 5–7.  The Court agrees with the Secretary.

Under Title VII, plaintiffs "must timely exhaust their administrative remedies before bringing their claims to court." *Payne v. Salazar*, 619 F.3d 56, 65 (D.C. Cir. 2010) (internal quotations omitted). This exhaustion requirement "serves the important purposes of giving the charged party notice of the claim and narrowing the issues for prompt adjudication and decision." *Park v. Howard Univ.*, 71 F.3d 904, 907 (D.C. Cir. 1995) (internal quotation marks and alteration omitted). Members of the Foreign Service may pursue discrimination claims administratively either through internal agency equal employment opportunity administrative processes or by filing with the Foreign Service Grievance Board. 22 U.S.C. § 4131(a)(1)(H); *id.* § 4139(b). In evaluating whether a Title VII plaintiff has exhausted her administrative remedies, the Court may take notice of public records, such as EEOC and Board complaints and decisions, without converting a motion to dismiss into a motion for summary judgment. *See Vasser v. McDonald*, 2016 WL 7480263, at *6 (D.D.C. Dec. 29, 2016); *see also Williams v. Chu*, 641 F. Supp. 2d 31, 35 (D.D.C. 2009) ("A plaintiff's EEOC charge and the agency's determination are both public records, of which this Court may take judicial notice." (quotation marks and alteration omitted)).

While Hill was entitled to exhaust his claim of race discrimination based on his one-day suspension before either the EEOC or the Board, the record in this case makes clear that he failed to exhaust his claim before either tribunal. As for the EEOC proceeding, Hill's EEOC complaint never references the one-day suspension. *See* Mot. to Dismiss, Ex. 11 (EEOC Complaint). Meanwhile, in its April 14, 2015 letter to Hill, the EEOC specifically clarified the proceeding by identifying the four "Accepted Allegations" at issue: that Hill had been (1) "removed from [his] role as Team Lead"; (2) "restricted from travel and training"; (3) "issued a Letter of Admonishment"; and (4) "subjected to a hostile work environment." *Id.* Ex. 12 (EEOC Letter).

None of these "Accepted Allegations" involved the one-day suspension.  In short, as Hill himself

puts it in his complaint, the "EEOC case did not seek to overturn the one-day suspension."

Compl. ¶ 76.  Accordingly, Hill did not exhaust such a claim before the EEOC.

As for the Board proceeding, the record is even clearer that Hill did not advance a claim

of race discrimination based on his one-day suspension.  While Hill's claim before the Board did

challenge his one-day suspension, Hill specifically and repeatedly disclaimed any claim of race

discrimination based on the suspension.  As noted above, Hill and the State Department jointly

stipulated that the matter before the Board did "not involve a claim of racial discrimination, and

thus there is no need for the Board to determine whether it is permitted to address any such

claim."  Joint Memorandum at 1–2.  The parties subsequently reiterated that Hill "has not argued

that his one-day suspension should be overturned because it was racially discriminatory."  *Id.* at

2.  Given the explicit nature of these joint stipulations, it cannot be said that Hill exhausted a

claim of race discrimination on the basis of his one-day suspension before the Board.

In response to this exhaustion argument, Hill criticizes the Secretary for taking the

"position that Hill, who laboriously litigated claims in front of both the EEOC and the [Board],

somehow pursued this issue in neither place."  Dkt. 12 (Opp'n to Mot. to Dismiss) at 11.  But

that is precisely what occurred.  Before the EEOC, Hill pursued a claim of race discrimination,

but predicated that claim on adverse employment actions other than the one-day suspension.

Before the Board, meanwhile, Hill challenged the one-day suspension, but explicitly and

affirmatively disclaimed any claim of race discrimination arising out of that suspension.  As to

the claim that Hill now advances before the Court—a claim of race discrimination on the basis of

the suspension—the Secretary is therefore correct to argue that Hill "pursued this issue in neither

place."  *Id.*

Hill contends that the Board's application of the election-of-remedies provision prevented him from mounting the procedural argument that his suspension should have been overturned on the basis of the witnesses' racial biases against him.  Compl. ¶¶ 75, 77; *see also* 22 U.S.C. § 4139(b).  But the question of whether the Board properly applied the election-of-remedies provision does not bear on the question of whether Hill adequately exhausted a claim of race discrimination arising out of his one-day suspension.  Title VII's exhaustion requirement "serves the important purposes of giving the charged party notice of the claim and narrowing the issues for prompt adjudication and decision."  *Park*, 71 F.3d at 907.  The fact remains that Hill never presented such a claim to either the EEOC or the Board, the Secretary never had a chance to defend against such a claim at the administrative level, and no administrative tribunal had the chance to rule on such a claim and narrow it accordingly for prompt adjudication before a court.  Accordingly, because Hill failed to exhaust this claim, the Court will grant the Secretary's motion to dismiss it.

### B.  Race Discrimination Claim Regarding Hill's Removal from Leadership Role

Count III of Hill's complaint alleges that the Secretary "discriminated against [Hill] on the basis of his race" by "removing him from his leadership position with supervisory authority, and leaving [him] without any daily duties, subordinates, or supervisory authority."  Compl. ¶ 115.  The complaint alleges that Hill's Caucasian team members "were racially biased against [him]," and believed that "black men are violent, aggressive, and threatening; and that black men should take orders, not give them."  *Id.* ¶ 116.  In support, Hill alleges multiple instances of his Caucasian team members disregarding his orders not to engage in racially offensive behavior, *see, e.g.*, *id.* ¶¶ 19, 20, 47, making unsupported complaints, *see, e.g.*, *id.* ¶¶ 23, 24, 31, 39, 42, and seeking to have him removed from his leadership position, *see, e.g.*, *id.* ¶¶ 45, 46, 49.   The

complaint further alleges that the Office "removed Hill based on the complaints from the Caucasian Team 2 members, making their complaints the proximate cause of the actions taken against Hill." *Id.* ¶ 117.  Finally, it alleges that "[m]anagement acted on the Team's accusations against Hill without investigating the facts, thereby negligently allowing the Team's discriminatory acts to achieve their desired effect." *Id.* ¶ 120.

Hill's claim rests on the theory that his Caucasian team members discriminated against him on the basis of race by defying his order, initiating conflicts with him, and repeatedly requesting transfers off his team.  Though Hill does not contend that his supervisors where themselves biased, he asserts that his supervisors gave effect to the racial animus of his subordinates by removing him from his leadership position in response to the subordinates' consistent defiance and unjustified complaints.  In short, Hill claims that his non-biased superiors acted as the "cat's paw" for his biased subordinates when they removed him from his role.

It is an open question in this Circuit whether a Title VII plaintiff can advance such a "cat's paw" theory of race discrimination on the basis of his co-workers' discriminatory actions. In *Staub v. Proctor Hospital*, 562 U.S. 411 (2011), the Supreme Court endorsed a theory of "cat's paw" liability based on the bias of *supervisors* who were uninvolved with the challenged employment action.  *Id.* at 421.  The Court held that if a supervisor had performed an act motivated by bias and intended for his act to cause an adverse employment action, and if the supervisor's act was indeed a "proximate cause" of the ultimate employment action, then the employer would be liable under Title VII.  *Id.*  However, the Court specifically held open the question "whether the employer would be liable if a co-worker, rather than a supervisor, committed a discriminatory act that influenced the ultimate employment decision." *Id.* at 422 n.4.  Since *Staub*, at least two Courts of Appeals have extended "cat's paw" liability to the

negligent acts of employers that give effect to the discriminatory animus of low-level employees. *See Vasquez v. Empress Ambulance Serv., Inc.*, 835 F.3d 267, 273–74 (2d Cir. 2016); *Velazquez-Perez v. Developers Diversified Realty Corp.*, 753 F.3d 265, 274 (1st Cir. 2014).  While this Court has recognized that "[i]t is theoretically possible . . . [that] supervisors may take adverse employment actions based on the discriminatory animus of a party's *co-workers*," *McCullough v. Whitaker*, 2019 WL 171404, at \*6 n.1 (D.D.C. 2019), "the D.C. Circuit has not yet weighed in on the question," *id.*

The Court will follow the weight of authority from other circuits and permit Hill to proceed with his race discrimination claim on a "cat's paw" theory of liability based on the racial animus of his co-workers.  As the First Circuit explained in *Velazquez-Perez*, where an employer takes adverse action against an employee based on racially motivated complaints made by co-workers, the employer is liable under Title VII if he knew, or reasonably should have known, that the co-workers' complaints were the product of discriminatory animus.  *Velazquez-Perez*, 753 F.3d at 273.  Such a claim bears a strong similarity to a hostile work environment claim cognizable under Title VII.  "In either situation, the same elements are present: an act of discrimination is allowed to cause harm by an employer that knows or reasonably should know of the discrimination."  *Id.*  An employer cannot avoid Title VII liability when firing an employee by turning a blind eye to the racial bias of the individuals making the complaints by which the employer seeks to justify the firing.  *See, e.g.*, *Griffin v. Washington Convention Ctr.*, 142 F.3d 1308, 1311–12 (D.C. Cir. 1998) (holding, prior to *Staub*, that a subordinate's bias may be relevant to the employer's liability where the ultimate decisionmaker is "not insulated" from the subordinate's influence).  In such circumstances, the discriminatory intent is imputed to the

employer, and the employer can be held liable under Title VII.  *See e.g., Vasquez*, 835 F.3d at 276.

Applying the prevailing standard for a claim of "cat's paw" liability based on the racial animus of a plaintiff's co-workers, a plaintiff may state a claim under Title VII where: (1) the plaintiff's co-worker makes statements maligning the plaintiff, for discriminatory reasons and with the intent to cause an adverse action; (2) the co-worker's discriminatory acts proximately cause the adverse action; and (3) the employer acts *negligently* by allowing the co-worker's acts to achieve their desired effect though the employer knows (or reasonably should know) of the discriminatory motivation.  *Velazquez-Perez*, 753 F.3d at 274; *see also Vasquez*, 835 F.3d at 276.

Viewing the complaint in the light most favorable to Hill, it alleges facts to support all three elements of this type of race discrimination claim.  First, it alleges that "Hill and Whitaker were the only African American Team 2 members and that the Caucasian Team members had been complaining about them, admitting they did not respect them, and requesting transfers to get away from them since the month after Hill took over as Team Leader."  Compl. ¶ 118.  The complaint enumerates multiple instances where the Caucasian team members complained about Hill, *see, e.g., id.* ¶¶ 23, 24, 31, 39, 42, and sought his removal from his leadership position, *see, e.g., id.* ¶¶ 45, 46, 49.  And the ongoing dispute over the Caucasian team members' use of the baboon logo and their joking references behind Hill's back to the baboon logo as "racist," *id.* ¶ 19, give rise to a reasonable inference that the Caucasian team members' treatment of Hill was racially discriminatory.  Second, "State admits it removed Hill based on the complaints from the Caucasian Team 2 members, making their complaints the proximate cause of the actions taken against Hill."  *Id.* ¶ 117.  Third and finally, a fair inference can be drawn that Collura and Rowan, Hill's supervisors, should have known that the Caucasian team members' complaints

were racially motivated.  *See id.* ¶ 120.  The complaint alleges: (1) a clear fissure between Hill

and Whitaker and the Caucasian team members from the very start of Hill's tenure, *see id.*

¶¶ 19–29; (2) that Hill complained to his supervisors about team members defying his order not

to use the racially offensive baboon logo, *see id.* ¶ 47; and (3) that several of the Caucasian team

members' complaints about Hill had a questionable basis, *see, e.g.*, *id.* ¶ 37, 43; yet,

(4) "[m]anagement acted on the Team's accusations against Hill without investigating the facts,"

*id.* ¶ 120.  Accepting all of these allegations as true, Collura and Rowan acted negligently by not

investigating the Caucasian team members' complaints before removing Hill from his leadership

role.[3]  And because Collura and Rowan acted negligently with respect to the information the

Caucasian team members provided, the racial bias of the team members is imputed to them.  *See*

*Vasquez, Inc.*, 835 F.3d at 276.  Accordingly, the Court will deny the Secretary's motion to

dismiss the race discrimination claim based on Hill's removal from his leadership position.[4]

---

[3] The Secretary has referenced information that might undermine the conclusion that Hill's
supervisors acted negligently when they stripped him of his supervisory role.  *See, e.g.*, Mot. to
Dismiss at 3.  While this information might be relevant at summary judgment, at the motion-to-
dismiss stage, the Court will limit its inquiry to the facts alleged in Hill's complaint.  *See*
*Banneker Ventures, LLC*, 798 F.3d at 1129.

[4] In contesting this conclusion, the Secretary places heavy reliance on *Tallbear v. Perry*, 318 F.
Supp. 3d 255 (D.D.C. 2018).  In that case, the Court dismissed a Title VII race discrimination
claim by a plaintiff who alleged that her co-workers had continued to use the word "Redskins" in
spite of her objection to the term.  *Id.* at 260–61.  But Tallbear's co-workers used the term in the
context of discussing the Washington Redskins, a local professional football team, and there was
no indication that they used the word as a racial slur or directed it at Tallbear herself.  *Id.* at 261.
Here, in stark contrast, Hill has alleged that his team members explicitly referred to the baboon
logo as "racist" and ordered hundreds of dollars' worth of baboon-branded gear behind his back
after he, the team leader, explained why the logo was offensive and ordered the team to stop
using it.  Compl. ¶ 19.  Moreover, and more importantly, Hill's co-workers engaged in extensive
and targeted efforts to remove him from his supervisory role, *see id.* ¶¶ 23, 24, 31, 39, 42, 45, 46,
49, and those efforts ultimately succeeded, *id.* ¶ 56.

### C.  Retaliation Claim

Count IV of Hill's complaint alleges that Hill "engaged in protected activity when he opposed his Team's frequent and continued use of a baboon symbol because it was racially offensive to him and other African Americans, and when he complained in writing to [Office] management about the hostile environment that his Team had created."  Compl. ¶ 125.  Hill further alleges that he was removed from his position less than a month and a half after complaining to [Office] management."  *Id.*  Finally, Hill alleges that his supervisors "retaliated against [him] for engaging in protected activity by removing him from his position as Team Leader and leaving him without any daily duties, supervisory authority, or subordinates."  *Id.* ¶ 126.

Title VII's anti-retaliation provision forbids employer actions that discriminate against an employee because he has opposed a practice that Title VII forbids.  42 U.S.C. § 2000e-3(a).  To establish a prima facie case of retaliation under Title VII, a plaintiff must show (1) that he engaged in statutorily protected activity; (2) that he was subjected to an adverse employment action; and (3) that there is sufficient evidence to infer a causal connection between the protected activity and the employment action.  *Wiley v. Glassman*, 511 F.3d 151, 155 (D.C. Cir. 2007). Opposition to discrimination is protected activity as long as it is founded in a good faith, reasonable belief that the challenged practice violated Title VII.  *Parker v. Baltimore & Ohio R.R. Co.*, 652 F.2d 1012, 1020 (D.C. Cir. 1981).  And a materially adverse action is one that, in context "well might have dissuaded a reasonable worker from making or supporting a charge of discrimination."  *Burlington N. & Santa Fe Ry. v. White*, 548 U.S. 53, 68 (2006) (internal quotation marks omitted).

The facts alleged in Hill's complaint satisfy these requirements.  First, Hill engaged in protected activity by complaining to his supervisors about his subordinates' direct defiance of his orders to stop using the racially offensive baboon logo.  Compl. ¶ 47.  Given that Hill had explained to the team members months earlier that he found the baboon logo offensive given its racial connotations, *id.* ¶ 18, it was reasonable for him to think that their continued insistence on using the logo, in defiance of his direct order, constituted a hostile work environment.  Second, Hill was subjected to an adverse employment action when he was stripped of his leadership role and left without any daily duties or supervisory authority.[5]  *Id.* ¶ 126.  Hill has alleged that leadership experience is deemed essential to advancement in the Foreign Service.  *Id.* ¶¶ 59–60. Accordingly, the prospect of removal from the Team Leader position "well might have dissuaded a reasonable worker from making or supporting a charge of discrimination."  *Burlington N. & Santa Fe Ry.*, 548 U.S. at 68.  Third and finally, given the very close temporal connection of less than two months between the protected activity and the adverse employment action, Compl. ¶ 125, Hill has alleged facts sufficient to support a causal connection between the two.  *See, e.g.*, *Holcomb v. Powell*, 433 F.3d 889, 902 (D.C. Cir. 2006) (recognizing a presumption of causation where "the employer had knowledge of the employee's protected activity, and . . . the adverse [] action took place shortly after the activity"); *Rattigan v. Gonzales*, 503 F. Supp. 2d 56, 77 (D.D.C. 2007) ("This Court has often followed a three-month rule to establish causation on the basis of temporal proximity alone.").  Therefore, because the facts alleged in Hill's complaint state a claim for retaliation under Title VII, the Court will deny the Secretary's motion to dismiss with respect to that claim.

---

[5] The Secretary appears to have conceded this point in his reply brief.  *See* Dkt. 15 (Reply in Supp. of Mot. to Dismiss) at 5 n.2.

## CONCLUSION

For the foregoing reasons, the Court grants in part and denies in part the Secretary's Partial Motion to Dismiss.  Dkt. 9.  Specifically, the Court grants the motion with respect to Count II (the Title VII race discrimination claim regarding Hill's one-day suspension), which is dismissed for failure to exhaust administrative remedies, but denies the motion with respect to Counts III (the Title VII race discrimination claim regarding Hill's removal from his leadership position) and IV (the Title VII retaliation claim).  Count I (the APA claim regarding the Board's decision), which the Secretary did not challenge, survives in full.  A separate order consistent with this decision accompanies this memorandum opinion.

_____
DABNEY L. FRIEDRICH
United States District Judge

Date: May 31, 2020