UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

ANTHONY HILL,

    *Plaintiff*,

v.

ANTONY J. BLINKEN,
  Secretary, U.S. Department of State,

    *Defendant.*[1]

No. 18-cv-2518 (DLF)

## MEMORANDUM OPINION

    Anthony Hill brings this action against the Secretary of the U.S. Department of State alleging that, when he was employed in the Department's Mobile Security Deployment team, he was unlawfully discriminated and retaliated against, in violation of Title VII of the Civil Rights Act of 1964. He also seeks review of the Foreign Service Grievance Board's decision to uphold his one-day suspension. Before the Court are the plaintiff's Motion for Partial Summary Judgment, Dkt. 35, and the defendant's Motion for Summary Judgment, Dkt. 34. For the reasons that follow, the Court will deny the plaintiff's motion and grant the defendant's motion in part and deny it in part.

---

[1] Pursuant to Rule 25(d), of the Federal Rules of Civil Procedure, Antony Blinken, the Secretary of the U.S. Department of State, has been substituted for Michael Pompeo as the defendant.

I.  **BACKGROUND**

  A.  **Factual background**

Anthony Hill joined the Department of State's Mobile Security Deployment team on August 25, 2013.  Def.'s Statement of Undisputed Material Facts ¶ 2, Dkt. 34-2.[2]  He eventually became the team leader of one of the deployment teams, Team 2.  *Id.* ¶ 4; Pl.'s Statement of Genuine Issues & Response to Def.'s Statement of Undisputed Material Facts ¶ 2, Dkt. 42-1.  In this role, Hill's supervisory chain consisted of Justin Rowan as his first-line supervisor; Nicholas Collura as his second-line supervisor; and Kevin Maloy, the Director of the Mobile Security Deployment, as his third-line supervisor.  Def.'s Statement of Facts ¶ 7.  Under Hill's leadership, Team 2, among other things, deployed to Bangui, Central African Republic from September through November 2014.  *Id.* ¶ 19.

Around May 2014, Hill's subordinates on Team 2 included at least three white men—Ben Horner, Dan Balocki, and Steve Stockl—and one African American man—Steven Whitaker.  *Id.* ¶¶ 10, 12.  After learning that Team 2's "unofficial team logo[]" was a baboon, *id.* ¶ 8, Hill, who is African American, explained to his subordinates that he "found the . . . logo to be offensive," *id.* ¶ 12.  Hill asserts that, even after he expressed his concerns about the logo, he saw team members using the logo, including while deployed to the Central African Republic.  *Id.* ¶ 20.  After returning from this deployment, on November 5, 2014, Hill emailed Team 2, Rowan, and Collura explaining that he continued to find the baboon logo "extremely offensive."  *Id.* ¶ 26.  Later that day, Collura emailed the entire Mobile Security Deployment team banning use of informal logos like the baboon.  *Id.* ¶ 27.

---

[2] The Court cites the defendant's Statement of Facts if a fact is undisputed.  If a fact is disputed, it will indicate as such.

The parties dispute the facts relating to three incidents involving Hill and his subordinates during Hill's tenure as team leader.  According to Balocki, at a June 2014 training exercise at the Panthera Training Center, Hill pushed him down the stairs during the exercise and called him an "asshole."  *Id.* ¶ 15; Pl.'s Resps. ¶ 15.  Jennifer Socha, a female member of Team 3, asserts that at an August 2014 joint training between Teams 2 and 3, Hill "inappropriately made a comment about her weight and grabbed her belly."  Def.'s Statement of Facts ¶ 17; Pl.'s Resps. ¶ 17.  All agree that on October 10, 2014, while Team 2 was deployed to Bangui, Hill "got into a loud argument" with Whitaker and Stockl.  Def.'s Statement of Facts ¶ 24.  The Secretary asserts that, during this argument, Hill stated "something along the lines of 'let's go out back' or 'I'll take you out back.'"  *Id.*  Hill, for his part, admits to stating "let's go out back," but he contends that he made that statement because he saw the "top official at the Embassy" nearby and wanted to take the argument out of the official's view.  Pl.'s Resps. ¶ 24.

During Hill's time as team leader, some of the members of Team 2, including Stockl and Balocki, as well as newer, white members, Palmer Jones and Thomas Verhagen, expressed concerns about Hill's leadership.  Def.'s Statement of Facts ¶ 25.  For example, on October 1, 2014, Stockl emailed Rowan asking to be transferred from Team 2 following their deployment.  *Id.* ¶ 22.  On October 28, Jones also emailed Rowan, copying Stockl, Balocki, and Verhagen—but not Whitaker—to request a meeting to discuss "ongoing team issues."  *Id.* ¶ 25.  These four team members eventually met with another individual of Rowan's rank, David Jordan, on November 10, and explained that they did not "want to work for Hill anymore."  *Id.* ¶¶ 25, 28.  Around the same time, Rowan, Collura, and Maloy also learned of Socha's allegations against Hill.  *Id.* ¶ 29.

On December 12, 2014, Rowan instructed Hill to not attend a Team 2 training due to "pending issues with respect to your conduct as a first-line supervisor."  *Id.* ¶ 32.  The same day,

3

Rowan also wrote to Maloy and Collura to recommend that Hill be removed as team leader of Team 2. Pl.'s Resps. ¶ 35. In December 2014, Hill was removed from his position as team leader and would not return. Def.'s Statement of Facts ¶¶ 35, 39–40, 42. He was initially reassigned to another division, *id.* ¶ 39, and was also offered a Unit Chief position within the Mobile Training Team that he declined, *id.* ¶ 40. On February 10, 2015, Hill received a letter of admonishment regarding the June 2014 stairwell incident and the October 2014 altercation. *Id.* ¶ 41.

On December 19, 2014, Rowan asked the Office of Special Investigations to initiate an investigation into the complaints Hill's subordinates made against him. *Id.* ¶ 36. Elizabeth Marmesh, who was familiar with some of the witnesses and complaining parties, including Socha, was assigned to lead the investigation. *Id.* ¶ 37. She concluded in her March 3, 2015 investigation report that "the allegations of workplace violence" by Hill were "substantiated." *Id.* ¶ 44.

On October 5, 2015, Hill received "a proposal to suspend him for one[]day" based on his treatment of Socha during the August 2014 joint training. *Id.* ¶ 48. The one-day suspension was based on three allegations: that Hill "(1) grabbed Ms. Socha's stomach, (2) made a comment regarding Ms. Socha's belly fat, and (3) made a comment regarding rubbing sunscreen on Ms. Socha." *Id.* ¶ 49. Though Hill admitted to calling Socha fat, he disputed the other allegations. *Id.* Hill's suspension was sustained by the Deputy Assistant Secretary, *id.*; as a result, Hill's "name was removed from the rank-order list and he was ultimately not promoted during [the 2015] promotion cycle," *id.* ¶ 50. Hill's grievances from the suspension were also denied by the Deputy Assistant Secretary for Human Resources, *id.* ¶ 51, and the Foreign Service Grievance Board, *id.* ¶ 52. The Board concluded that two of the three allegations—grabbing Socha's stomach and making a comment regarding her weight—were established by a preponderance of the evidence,

but the alleged comment regarding sunscreen was not. *Id.* The Board also denied Hill's request for reconsideration. *Id.* ¶ 53.

### B. Procedural history

On October 30, 2018, Hill filed a complaint in this Court challenging the Board's denial of his grievance as arbitrary and capricious under the Administrative Procedure Act. Compl. ¶¶ 83–100, Dkt. 1. He also alleged Title VII claims—that he had been discriminated against on the basis of race and retaliated against for opposing Team 2's use of a baboon symbol. *Id.* ¶¶ 101–129. The Court granted in part and denied in part the Secretary's motion to dismiss the complaint. *Hill v. Pompeo*, No. 18-cv-2518, 2020 WL 2838585 (D.D.C. May 31, 2020). Now before the Court are Hill's motion for partial summary judgment on his APA claim, Dkt. 35, and the Secretary's motion for summary judgment, Dkt. 34.

## II. LEGAL STANDARD

### A. Summary judgment

Under Rule 56, summary judgment is appropriate if the moving party "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Anderson v. Liberty Lobby Inc.*, 477 U.S. 242, 247–48 (1986). A "material" fact is one that could affect the outcome of the lawsuit. *See Liberty Lobby*, 477 U.S. at 248; *Holcomb v. Powell*, 433 F.3d 889, 895 (D.C. Cir. 2006). A dispute is "genuine" if a reasonable jury could determine that the evidence warrants a verdict for the nonmoving party. *See Liberty Lobby*, 477 U.S. at 248; *Holcomb*, 433 F.3d at 895. In reviewing the record, the court "must draw all reasonable inferences in favor of the nonmoving party, and it may not make credibility determinations or weigh the evidence." *Reeves v. Sanderson Plumbing Prods.*, 530 U.S. 133, 150 (2000).

A party "opposing summary judgment" must "substantiate [its allegations] with evidence" that "a reasonable jury could credit in support of each essential element of [its] claims." *Grimes v. District of Columbia*, 794 F.3d 83, 94 (D.C. Cir. 2015). The moving party is entitled to summary judgment if the opposing party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

**B.    Administrative Procedure Act**

In an Administrative Procedure Act case, summary judgment "serves as the mechanism for deciding, as a matter of law, whether the agency action is supported by the administrative record and otherwise consistent with the APA standard of review." *Sierra Club v. Mainella*, 459 F. Supp. 2d 76, 90 (D.D.C. 2006). The Court will "hold unlawful and set aside" agency action that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," 5 U.S.C. § 706(2)(A); "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right," *id.* § 706(2)(C); or "unsupported by substantial evidence," *id.* § 706(2)(E).

In an arbitrary and capricious challenge, the core question is whether the agency's decision was "the product of reasoned decisionmaking." *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins.*, 463 U.S. 29, 52 (1983). The court's review is "fundamentally deferential—especially with respect to matters relating to an agency's areas of technical expertise." *Fox v. Clinton*, 684 F.3d 67, 75 (D.C. Cir. 2012) (internal quotation marks and alteration omitted). The court "is not to substitute its judgment for that of the agency." *State Farm*, 463 U.S. at 43. "Nevertheless, the agency must examine the relevant data and articulate a satisfactory explanation for its action including a rational connection between the facts found and the choice made." *Id.* (internal quotation marks omitted). When reviewing that explanation, the court "must consider whether the decision was based on a consideration of the relevant factors and whether there has

been a clear error of judgment." *Id.* (internal quotation mark omitted).  For example, an agency action is arbitrary and capricious if the agency "entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before [it], or [the explanation] is so implausible that it could not be ascribed to a difference in view or the product of agency expertise."  *Id.*  The party challenging an agency's action as arbitrary and capricious bears the burden of proof.  *Pierce v. SEC*, 786 F.3d 1027, 1035 (D.C. Cir. 2015).

### III.    ANALYSIS

Hill moves for summary judgment only on his claim that the Foreign Service Grievance Board's decision was arbitrary or capricious in violation of the APA.  Pl.'s Mem. at 19–20, Dkt. 35-1.  The Secretary moves for summary judgment on all of Hill's remaining administrative, race discrimination, and retaliation claims.  Def.'s Mem. at 12, Dkt. 34-1.

#### A.    Administrative Procedure Act

The Foreign Service Act of 1980 permits any party "aggrieved" by a ruling of the Foreign Services Grievance Board to "obtain judicial review of a final action of . . . the Board . . . in the district courts of the United States."  22 U.S.C. § 4140(a).  In such a challenge, the APA applies "without limitation or exception."  *Id.*  Hill contends that the Board's decision violated the APA because the Board incorrectly found that the Foreign Service Act's election of remedies provision, *id.* § 4139(a)(1), barred it from considering certain evidence, and because it failed to consider other relevant evidence.  Pl.'s Mem. at 19–20.  Neither challenge succeeds.

##### 1.    *Election of remedies provision*

The Foreign Service Act's election of remedies provision provides that "[a] grievant may not file a grievance with the Board if the grievant has formally requested, prior to filing a grievance, that the matter or matters which are the basis of the grievance be considered or resolved and relief be provided under another provision of law . . . ."  22 U.S.C. § 4139(a)(1).  Based on

this provision, the Board declined to consider two "matters" that it viewed as covered by Hill's parallel EEOC complaint: (1) any racial bias of the witnesses who corroborated Socha's version of events, including Collura, Rowan, Jones, Balocki, and Stockl, Def.'s Ex. 30 (Board Dec.) at 18, 20, Dkt. 34-3; and (2) any "purported inaccuracies" in Memoranda of Interview for the witnesses' interviews "pertaining to matters for which [Hill] was not disciplined," *id.* at 20–21 n.12. The Court need not decide whether the Board's interpretation of the election of remedies provision was correct because the Board's decision not to consider the above matters was not material to its ultimate conclusions. *See PDK Lab'ys, Inc. v. DEA*, 362 F.3d 786, 799 (D.C. Cir. 2004) ("If the agency's mistake did not affect the outcome, if it did not prejudice the petitioner, it would be senseless to vacate and remand for reconsideration.").

As to the racial bias of the corroborating witnesses, the Board explicitly stated that any bias did not affect its decision; in its ruling on Hill's motion for reconsideration, it noted that, even if its legal interpretation was error, its final ruling would remain undisturbed. Def.'s Ex. 31 (Board Dec. on Reconsideration) at 11–12. The Board wrote: "[E]ven assuming that several of the witnesses in the case were found to have harbored racial animus against [Hill], such a finding would not warrant setting aside [its] ruling as to the touching incident." *Id.* at 12. Thus, the Court need not, and cannot, determine *de novo* whether consideration of such bias would have changed the Board's decision, even though evidence of witness bias is generally a "relevant factor" that an agency cannot ignore, *see* Pl.'s Mem. at 26–28 (citing *Olson v. Powell*, No. 02-1371, 2005 U.S. Dist. LEXIS 50270 *11 (D.D.C. Feb. 3, 2005)). The Board's conclusion was supported by the record.

As to the allegations that Hill said Socha was "fat" and inappropriately touched her stomach, the Board carefully considered "considerable evidence" establishing various witnesses'

8

animus against Hill on non-racial grounds. Board Dec. at 35. This included evidence that Jones, Stockl, and Balocki "were involved in a concerted effort to have [Hill] removed as their team leader, or to have themselves removed from his team." *Id.* at 34–35. Taking into account this evidence, the Board credited factors that weighed in favor of the witnesses' credibility, such as Balocki's "contemporaneous recording of his having seen the touching"; the fact that Stockl and Balocki were interviewed *after* Hill had already been removed as team leader, *id.* at 36; and the volume of "corroborating evidence, including Socha's own statements and actions," *id.* at 38. A number of these factors, including "the lack of contradiction of [the witnesses'] . . . statements by other evidence[] and the absence of 'inherent improbability' of [their] version of events," led the Board to further conclude any finding of racial bias would "not warrant a conclusion that [the witnesses'] otherwise corroborated, and thus creditable, statements should be disregarded." Board Dec. on Reconsideration at 12. The Board also pointed out that Hill had never alleged "that the primary complaining witness herself [Socha] was racially biased against him." *Id.* The Board's discussion of extensive evidence in the record—including evidence regarding the credibility of not only the allegedly biased witnesses, but also Socha herself—is an adequate explanation for its conclusion that Hill called Socha "fat" and touched her inappropriately. *See Toy v. United States*, 263 F. Supp. 2d 1, 7 (D.D.C. 2002) ("The FSGB . . . weighed the evidence on both sides of the issue and adequately explained its decision not to find Consul General Warren's testimony biased. This court will not disturb such a finding . . . ." (citation omitted)); *Olson v. Clinton*, 602 F. Supp. 2d 93, 103 (D.D.C. 2009), *aff'd*, 409 F. App'x 359 (D.C. Cir. 2011).

The Board's refusal, based on the election of remedies provision, to consider minor and irrelevant inconsistencies between the witnesses' statements and the corresponding Memoranda of Interview was also immaterial to its decision. *See* Board Dec. at 26–27; Joint Appendix (JA) at

9

670–71, 684–87, Dkt. 48. A court does not review "whether the Board's decision was perfectly correct, but whether it was arbitrary." *Clinton*, 602 F. Supp. 2d at 102. None of the alleged inconsistencies are sufficient to render the Board's final ruling arbitrary or capricious.

   2.   *Failure to consider other evidence*

Despite Hill's assertions to the contrary, *see* Pl.'s Mem. at 30–34, the Board adequately considered "contradictions and inherent improbabilities" in witness testimony, *id.* at 30–32, and improprieties in the Office of Special Investigations inquiry, *id.* at 32–34.

First, the Board acknowledged that Socha, Stockl, and Balocki used "different words to describe the actual touching," Board Dec. at 31, and that they "offered somewhat different descriptions of the location where the incident took place," *id.* at 32. Even so, the Board concluded that these discrepancies made "no meaningful difference," as all witnesses agreed that there was "unwanted physical touching, . . . [which] is the most salient point in terms of whether to sustain the [allegations]." *Id.* at 31; *see also id.* at 32 ("[T]he slight discrepancies identified by grievant as to location of the incident do not alter the central point, that witnesses corroborate Socha's statement that the touching occurred."). The Board carefully considered the consistency of the witnesses' statements throughout the investigation, as well as Team 3 member John Aardapel's statement that Titus described the touching incident to him that evening. *Id.* at 31–33. The Board's findings are supported by the record, and the Court will not further "reweigh the conflicting evidence or otherwise substitute [its] judgment for that of the [Board]." *Indiana Municipal Power Agency v. FERC*, 56 F.3d 247, 254 (D.C. Cir. 1995). That the Board did not specifically discuss the differences between the witnesses' statements regarding the *timing* of the Hill's alleged touching is not fatal to its decision, *see* Pl.'s Mem. at 31. The Board reviewed the relevant statements and explained that any minor inconsistencies did not sufficiently outweigh the

10

witnesses' consistent testimony that the underlying incident did take place.  Because the Board's "path may reasonably be discerned" and "minimally contain[s] a rational connection between the facts found and the choice made," the Court will not second guess its decision.  *Frizelle v. Slater*, 111 F.3d 172, 176 (D.C. Cir. 1997) (cleaned up).

Second, the Board also carefully considered, in eight pages of reasoned analysis, alleged improprieties in the investigation and concluded that "preponderant evidence shows the . . . investigation and its resulting [record] are a valid basis on which the Department could base its suspension decision."  Board Dec. at 21–28.  The Board correctly characterized the relationships of the investigator, Marmesh, to Balocki, Stockl, Socha, and Jones, *compare* Board Dec. at 21, *with* Pl.'s Mem. at 32 & n.10; JA 513–14, and found that their limited personal interactions did not constitute the "substantial personal ties outside the workplace" that would require Marmesh to report a conflict of interest under 12 FAM 221.7-1(a), Board Dec. at 23.  That Stockl stated at a deposition that he "consider[ed] [Marmesh] a friend," JA 513–14; Pl.'s Mem. at 33, did not provide grounds to reject the validity of the entire investigation, *see* Board Dec. at 25 & n.16 (considering Stockl's deposition statements regarding his relationship with Marmesh).  Finally, as discussed above, *see supra* section III.A.1, any minor mischaracterizations of witness statements were not so probative as to undermine the Board's finding that Marmesh's investigation could be credited.

Accordingly, the Court will grant summary judgment in favor of the Secretary on Hill's APA claim.

**B.     Discrimination**

As the Court previously held, Hill's discrimination claim is governed by a theory of "'cat's paw' liability based on the racial animus of a plaintiff's co-workers."  2020 WL 2838585 at *8.  Under this theory Hill must establish that: (1) his "co-worker[s] ma[de] statements maligning [him], for discriminatory reasons and with the intent to cause" an adverse action; (2) "the co-

worker[s'] discriminatory acts proximately cause[d]" the adverse action; and (3) "the employer act[ed] negligently by allowing the co-worker[s'] acts to achieve their desired effect though it kn[ew] (or reasonably should [have] know[n]) of the discriminatory motivation." *Velazquez-Perez v. Developers Diversified Realty Corp.*, 753 F.3d 265, 274 (1st Cir. 2014); *see also Morris v. McCarthy*, 825 F.3d 658, 672 (D.C. Cir. 2016) (applying *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1972), framework to cat's paw liability elements). Applying this standard, a reasonable jury could find in favor of Hill on each prong.

  1.  *Discriminatory animus*

First, there is record evidence that Hill's white co-workers, including Stockl, Balocki, and Jones, made statements against Hill that were both (1) intended to cause his removal as team leader of Team 2 and (2) motivated by racial animus.

To be sure, the record is ambiguous as to whether Hill's team members intended to be transferred off his team or have Hill removed from his position. *Compare* Pl.'s Ex. 43 at 1, Dkt. 42-3 (Jordan's documentation of his conversation with white Team 2 members noting that "none of them want to work for Hill anymore" and that "there was a very good chance that [Hill] will not continue to be their [team leader]"), *with* Pl.'s Ex. 35 at 6, ("Following my return from Bangui I am requesting I be transferred to another team."); Pl.'s Ex. 33 at 2. But Hill has produced sufficient evidence to create a genuine dispute, and the D.C. Circuit recently held that a transfer in position as well as a removal can, in certain circumstances, constitute an adverse action. *See Chambers v. District of Columbia*, 35 F.4th 870, 872 (D.C. Cir. 2022); *see also Stewart v. Ashcroft*, 352 F.3d 422, 427 (D.C. Cir. 2003) ("[W]ithdrawing an employee's supervisory duties constitutes an adverse employment action."); *Ohal v. Bd. of Trs. of Univ. of Dist. of Columbia*, 100 F. App'x 833, 834 (D.C. Cir. 2004) ("[A] material reduction of supervisory responsibilities . . . can amount

to an adverse employment action.").

Further, Hill has put forth sufficient evidence that the team members' statements were motivated by discriminatory animus. In May 2014, when Hill first became team leader, he told the members of his team that he found the baboon logo "offensive" because "monkey and black people have been associated for years and it has a racial connotation." Pl.'s Ex. 13 (Hearing Transcript) at 65. Nonetheless, Hill's complaining subordinates disregarded his concerns and ordered more gear with the logo—even though they had never owned any such gear. *See* Pl.'s Ex. 8 (Balocki Dep.) at 27, 32–33; Pl.'s Ex. 20 (Stockl Dep.) at 77. Hill's subordinates wore the gear during work hours and handed it out to local residents while deployed. *See* Pl.'s Ex. 1 at 61; Pl.'s Ex. 14 (Hearing Transcript) at 629. They also made jokes about the possible racist associations of the logo. *See* Pl.'s Ex. 21 at 1; Pl.'s Ex. 22. The experience of Whitaker, the only other African American on Team 2, further supports an inference of racial animus. Record evidence shows that white team members left Whitaker off of emails that expressed concerns about Hill's leadership. *See* Pl.'s Ex. 42; Pl.'s Ex. 43; Pl.'s Ex. 32. They also did not invite Whitaker to a meeting with Jordan, where they discussed only "tolerat[ing] Whitaker under the right leadership." Pl.'s Ex. 43 at 1. This constitutes additional evidence on which a reasonable jury could conclude that racial animus motivated Stockl, Balocki, and Jones to complain about Hill.

   2.   *Proximate cause*

It is also possible for a reasonable jury to conclude that team members' racially motivated complaints were a proximate cause of Hill's removal as team leader. According to an email written by Rowan, Hill's removal as team leader was predicated primarily on three incidents: (1) Hill's altercation with Balocki in the stairwell during a training exercise in June 2014, (2) his "fat" comment and touching incident with Socha, and (3) his confrontation with Stockl while deployed in October 2014. Def.'s Ex. 20 at 2, Dkt 34-3. But there is record evidence that supports the

inference that the team members' racially motivated complaints—and not simply these incidents underlying their complaints—were "directly related" to the decision of Hill's superiors to remove him as team leader. *Morris*, 825 F.3d at 672. As this Circuit has stated, Hill's superiors' delayed response to the complaints, "by itself, could cast doubt on the [Secretary's] proffered reason." *DeJesus v. WP Company LLC*, 841 F.3d 527, 534 (D.C. Cir. 2016). Despite the fact that Hill's superiors knew about the above incidents shortly after they happened, they did not take any action against Hill until after Jones, Balocki, and Stockl voiced their concerns about Hill. *See* Pl.'s Ex. 15 (Hearing Testimony) at 1134; Pl.'s Ex. 16 at 1384, 1399. While it is certainly possible that Hill's supervisors reacted to these "nonissue[s]" in a delayed fashion because of the developing "pattern" of allegations relating to Hill's poor leadership, *see* Pl.'s Ex. 16 at 1398, 1400 (Maloy hearing testimony), a reasonable jury could also conclude that the racial animus of Hill's team members was a motivating factor in Hill's removal. *See Coats v. DeVos*, 232 F. Supp. 3d 81, 90 (D.D.C. 2017) ("For present purposes, it is sufficient for the Court to conclude that [the complaining subordinates'] significant involvement in the removal proceedings . . . raises a substantial issue of fact about whether [the final] decision was insulated from [their] subjective views." (cleaned up)).

What is more, at this stage, the Court cannot conclude that any independent investigation into the allegations against Hill, *see* Def.'s Mem. at 24, Dkt. 34-1; Def.'s Reply at 9, Dkt. 47, was a "superseding cause" that "br[oke] the causal chain between [any] bias and an adverse employment action." *Morris*, 825 F.3d at 672. Hill's superiors made little to no effort to interview witnesses of the June 2014 and October 2014 incidents, *see* Pl.'s Ex. 26 (Rowan Dep.) at 55, 61; Def.'s Ex. 36 (Collura Dep.) at 52, 54, 66; Pl.'s Ex. 4 at 10; Pl.'s Ex. 25 at 4; Pl.'s Ex. 28 (Collura Dep.) at 57. The Secretary also admits that "MSD management made the decision to temporarily

remove [Hill] from Team 2[, on December 12], *before* the [Office of Special Investigations] investigation took place." Def.'s Reply at 8 (emphasis added).

To be sure, there is some question whether Hill's December 12 removal from Team 2 leadership was only meant to be temporary, *see id.*, but too this is a disputed fact. Put another way, it is disputed whether Hill's December 12 removal as Team Leader was solely a measure to separate him from the complaining members until a full investigation could be conducted, or was also a permanent removal based on those members' concerns. Emails suggest that Hill was to be re-assigned to another position immediately and that Team 2 would deploy in January 2015 with a different team leader.[3] *See* Def.'s Ex. 18. Further, on December 16—three days *prior* to the initiation of any investigation—Rowan and Collura consulted with a Human Resources Officer, T.J. Shelton, who advised that "removing Mr. Hill from Team 2 presented no issue" and that "a letter of admonishment [should] be drafted and issued to Mr. Hill." Def.'s Ex. 20 at 3. Rowan testified that he had no "visibility on the results of the [eventual] investigation," including even when the investigation was completed. Pl.'s Ex. 15 (hearing transcript) at 1106. And most importantly, Rowan also testified that Hill's reassignment was *not* based on the results of the investigation. *Id*.

Moreover, regardless whether Hill was permanently reassigned before the investigation was completed, there is little question that he was at least transferred on December 12, before any investigation had even begun. After he returned from leave in December 2014, Hill was reassigned

---

[3] For example, on December 10, 2014, well before an investigation of Hill was even initiated, a State employee stated in an email that Rowan had asked him whether he would be available to take over as Team 2 leader. *See* Pl.'s Ex. 44 at 1. And in a December 12 email, Rowen himself appears to propose to his supervisors that they permanently remove Hill as Team 2's leader. *See* Def.'s Ex. 18 ("[I]t is in everyone's best interest that Anthony no longer remain as [team leader] for Team 2.").

to another position, described as "desk duty" by the Office of Special Investigations. *See* Pl.'s Ex. 37 at 4; Def.'s Ex. 5 at 57–58. Shortly thereafter, he was offered a job as the Unit Chief of the Mobile Training Team, which he declined. Def.'s Ex. 35 at 59–61. It is at least disputed whether either assignment was comparable to the Team 2 leader position, as neither involved the same supervisory or other responsibilities. *See id.*; Pl.'s Ex. 10 at 59–60.

In sum, there is some evidence that would enable a reasonable jury to conclude that, on December 12, 2014, Hill was removed from his team leader position on the basis of his subordinates' racially motivated complaints, rather than based on any investigation.

3.   *Negligence of employer*

Finally, a reasonable jury could conclude that the Secretary acted negligently by acting on the discriminatory complaints of Hill's co-workers because there is record evidence that Hill's superiors either knew or should have known that Jones, Balocki, and Stockl had discriminatory motives. Most notably, in November 2014, around the same time that Team 2 members informed Hill's supervisors of their concerns about Hill's performance, in an email to Team 2 and his superiors, Hill expressed his concerns about racism in the team:

> When I took over as Team Leader for Team 2 in May 2014 I informed members of Team 2 at the time that I found the symbol for Team 2 'The Baboon' offensive. I offered to everyone to come up with a symbol that would better represent Team 2 and that everyone could get behind[;] to date I have received no recommendations. I was shocked and disappointed to learn that some are still using the Baboon to represent Team 2 after my objections to the image. The U.S. Equal Employment Opportunity Commission [contains a] Race/Color Discrimination & Harassment section[] . . . . As the only African American Team Leader in MSD I find it extremely offensive that my Team is represented by a Baboo[n].

Def.'s Ex. 14 at 2–3. Rowan and Collura were both copied on this email. Although this email was sent about a month before Hill was removed from his position as team leader, it is sufficient to have put Hill's superiors on notice that the complaining Team 2 members might be acting, at least in part, with racially discriminatory motives when complaining about Hill.

16

As noted, it is also disputed whether Hill's superiors collected individual witness statements or conducted any further investigation before removing Hill as team leader. *See Mastro v. Potomac Elec. Power Co.*, 447 F.3d 843, 856 (D.C. Cir. 2006). And to the extent that any lack of investigation was justified because Collura witnessed the October 2014 Bangui incident or because Hill admitted to parts of the underlying incidents, these also are disputed facts, *see* Pl.'s Ex. 14 at 622–24; Def.'s Ex. 45 (Hill Dep.) at 167–68, Dkt. 43-3; Pl.'s Statement of Genuine Issues at 3–4, 5, Dkt. 42-1, that are best left to a jury to decide.

The Court therefore will deny the Secretary's motion. There remain genuine disputes of material fact that preclude the Court from concluding that Hill's co-workers did not make racially motivated statements to have Hill removed as team leader; that these statements did not cause Hill's removal; or that the Secretary was not negligent in acting on the statements.

### C. Retaliation

Courts also assess retaliation claims made under Title VII under the *McDonnell Douglas* framework. *See Jones v. Bernanke*, 557 F.3d 670, 677 (D.C. Cir. 2009). Under that framework, the employee "must first make out a *prima facie* case of retaliation." *Iyoha v. Architect of the Capitol*, 927 F.3d 561, 566 (D.C. Cir. 2019). To establish a prima facie case of retaliation under Title VII, the plaintiff must show that (1) "he engaged in statutorily protected activity"; (2) "he suffered a materially adverse action by his employer"; and (3) "a causal link connects the two." *Id.* at 574 (internal quotation marks omitted). "If the plaintiff clears that hurdle, the burden shifts to the employer to identify the legitimate, . . . non-retaliatory reason on which it relied in taking the complained-of action." *Walker v. Johnson*, 798 F.3d 1085, 1092 (D.C. Cir. 2015). If the employer satisfies that burden, "the central question at summary judgment becomes whether the employee produced sufficient evidence for a reasonable jury to find that the employer's asserted

. . . reason was not the actual reason and that the employer intentionally . . . retaliated against the employee." *Id.* (cleaned up).

Hill contends that he engaged in statutorily protected activity when he opposed Team 2's use of a baboon as its logo, and that he was retaliated against when he was removed from his position as team leader because he had "point[ed] to racially offensive symbols and EEOC [g]uidance." Pl.'s Opp. at 38–39, Dkt. 42. Even assuming that Hill's assertions are sufficient to support a *prima facie* case of retaliation, the Court will grant summary judgment in favor of the Secretary on this claim because he has provided a legitimate, non-retaliatory reason for Hill's removal, and Hill has produced no evidence that the reason was pretextual.

As explained above, the Secretary has offered a non-retaliatory justification for removing Hill as team leader: Hill's superiors were acting on the "existing friction" between Hill and his subordinates, and the "pattern of behavior" alleged by Team 2 members. Def.'s Mem. at 28–29. There is considerable evidence in the record that supports this rationale. Rowan testified that he recommended Hill's removal because "there was friction and subordinates recording what they did," and given that "Team 2 was going up on crisis response status," it was better "to keep as much of that team as possible." Pl.'s Ex. 26 at 109. Emails from Rowan to both Hill and Hill's superiors reflect that the removal decision was made based on concerns around Hill's interactions with his subordinates. *See* Def.'s Ex. 11 at 3–4; Def.'s Ex. 20 at 2–3.

Hill has not provided sufficient evidence to permit a reasonable jury to conclude that this justification was pretext for a retaliatory motive. *See Walker*, 798 F.3d at 1093–95 ("The evidence of record must be such that a reasonable jury could not only disbelieve the employer's reasons, but conclude that the real reason the employer took a challenged action was [the] prohibited one."); *Minter v. District of Columbia*, 809 F.3d 66, 71 (D.C. Cir. 2015) ("Even if there were some

18

inconsistency in the proffered rationales, Minter would still need to prove that the 'actual reason' for her termination was retaliatory."). To be sure, as discussed above, *supra* section III.B, under Hill's cat's paw theory of liability, it is conceivable that the Secretary could be liable for *racial discrimination* if a jury were to find that Hill's supervisors were on notice that his subordinates had complained about him for racially discriminatory reasons and removed Hill from his position based on his subordinates' discriminatory complaints, without conducting a thorough investigation of their accuracy. But Hill has produced no evidence that would support a claim of *retaliation*, beyond the mere temporal proximity of his November 5, 2014 email to Team 2 to his December 2014 removal from his position. And, though temporal proximity "can establish a *prima facie* case of retaliation, dislodging an employer's nonretaliatory explanation as pretextual . . . requires positive evidence beyond mere proximity." *Waggel v. George Washington Univ.*, 957 F.3d 1364, 1376 (D.C. Cir. 2020) (cleaned up).

If anything, the undisputed facts in the record weigh against a finding of retaliatory pretext. After receiving Hill's email expressing his views on the baboon logo, Hill's superiors acted immediately to address Hill's concerns. The very same day that Hill emailed Team 2, Collura emailed Maloy:

> I highly recommend we eliminate all external team specific patches, coins[,] or any other non-official items. . . . I would like to send out a [management] notice asap explaining the elimination of all of the team specific memorabilia and the creation of just one specific MSD patch / coin that can be utilized.

Def.'s Ex. 14 at 1. Later that same day, Collura emailed the entire Mobile Security Deployment team:

> It is important for all of us to understand sensitivities that can be construed from team names or symbols. What might have an innocent meaning to some, can be offensive to others. MSD management i[s] committed to a work environment that is free of potentially offensive material or actions. From today forward, it is MSD office policy that all unofficial team symbols, nicknames[,] or paraphernalia are

> ban[ne]d from MSD office space, vehicles[,] or uniforms. . . . An official written policy will follow shortly[,] and violation will result in disciplinary action.

Def.'s Ex. 15.  Hill has thus failed to identify any evidence in the record from which a reasonable jury could conclude that the Secretary's reason for removing him as team leader was retaliatory. The Court will therefore grant summary judgment in favor of the Secretary on Hill's retaliation claim.

## CONCLUSION

For the foregoing reasons, the Court grants in part and denies in part the defendant's motion for summary judgment, and denies the plaintiff's motion for partial summary judgment. A separate order consistent with this decision accompanies this memorandum opinion.

_____
DABNEY L. FRIEDRICH
United States District Judge

March 3, 2023